**McNEIL et al. v. BOAGNI et al.**

No. 1258.

Court of Appeal of Louisiana. First Circuit.
March 6, 1934.

Dubuisson & Dubuisson, of Opelousas, for appellants.

R. Lee Garland and W. C. Perrault, both of Opelousas, for appellees.

MOUTON, Judge.

Mr. Lyman Guidry, employee of Mr. E. M. Boagni, one of the defendants, now deceased, represented herein by Richard O. Eckart and E. M. Boagni, Jr., his testamentary executors, as parties defendant and appellant under order of this court, while driving an auto belonging to his employer on Railroad avenue in Opelousas, collided with Henry Sims, November 23, 1932, who received injuries from which he died about a week after the accident.

His surviving widow, Charlotte McNeil, and three of his major heirs brought this suit in damages against E. M. Boagni and the Independence Indemnity Company, public liability insurer, for $11,625.

Judgment was rendered in solido against defendants for $1,750 with legal interest from judicial demand, from which defendants appeal.

Appellees having acquiesced in the correctness of the judgment dismissing the claim of the major heirs of deceased, our review of the case will be restricted to the contested issues between Charlotte McNeil, the surviving widow, and the defendants.

Railroad avenue runs north and south through the city of Opelousas, and North street, east to west into that avenue. One block south of North street, Bellevue street runs east to west into the avenue, likewise Landry street, one block south of Bellevue street, enters the avenue.

Mr. Guidry, driver of the car that caused the injury, drove into the avenue from Landry street, turned to his right as he entered it, and proceeded northward intending to go to the office of Mr. Boagni, his employer, which is situated some distance north of North street.

North street runs into Railroad avenue but does not continue across and therefore stops at its entrance into that avenue.

The first question to be determined is as to where the collision occurred.

Mr. Guidry, who was driving the Boagni

car and the only witness who actually saw the accident, says, when he first saw the deceased, the front of his car was "well past the north of North Street." He could not, however, fix the exact distance or the number of feet north of the north line of that street, where, he says, the accident occurred. If the front of his auto had "well passed" that line when he first saw the "figure," as he explains, it is therefore obvious that when he came in contact with the deceased, it was at some distance north of the north line of North street.' He testifies that this "figure" was about 7 or 8 feet from his car when he first saw it, but as the front of his car had then "well passed" the north line of that street, the collision must have happened at not less than 10 or 12 feet from that north line, according to Mr. Guidry's own testimony.

It is shown that Mr. Cahanin was driving a mule across Railroad avenue from the west towards the entrance of North street into that avenue just before the collision occurred and that deceased, Henry Sims, was coming behind him at a distance of about 30 or 40 feet. Mr. Cahanin had crossed the avenue with his mule and was about 20 feet in North street when he heard the noise caused by the impact between the car Mr. Guidry was driving and the deceased who, the evidence shows, was walking across the avenue, carrying pieces of wood and some ice under his arm.

Mr. Cahanin testifies that he picked up Henry Sims' hat about 3 or 4 feet from the south corner of North street, under the "overhead" light, which the record shows was an · electric light of the city and which was burning at the time. Cahanin also found a piece of ice in the middle of North street at the time he saw the hat of the deceased. This piece of ice was undoubtedly a broken piece of the ice the deceased was carrying under his arm across the avenue. The · fact that the hat was 3 or 4 feet from the south corner of North street and that the piece of ice was found in midway of that street, shows that the collision did not occur well beyond the north line of North street, as testified to by Mr. Guidry.

Counsel for defendants advance the contention that deceased on entering the avenue from the west may have diverted his course in a northeasterly direction in crossing, and, in consequence, was north of the north line of North street where Mr. Guidry says he was when struck.

The evidence shows that deceased was then living on Bellevue street which is one block southeast of North street and that deceased was then going to his home after his day's work. The evidence shows that deceased was following Mr. Cahanin who was driving his mule directly across the avenue towards North street, and we cannot conceive why deceased should have deviated to the north of North street, while intending to go southward from North street to Bellevue street where he lived. If there were in the evidence any proof that he had been attracted northward as he attempted to cross the avenue, there might be some support to sustain the contention urged by counsel, but in the total absence of the slightest proof of that character the reasonable conclusion is, that plaintiff was walking towards the entrance of North street in the avenue and not in line with the north side of North street, where the evidence shows there was no sidewalk, but that he was going towards the south line of that street where there was a sidewalk.

Another contention of counsel for defendants is, that the wind blew Henry Sims' hat after he was struck to where it was found near the south corner of North street.

The only witness who testified as to the weather condition at the time was Mr. Guidry, defendants' witness. His testimony on this subject is that the weather was very cloudy but that there was no rain, that the roadway was dry. He did not say that any wind was blowing, nor in what direction, hence there is no ground whatsoever to support the suggestion that Sims' hat might have been blown from beyond the north line of North street where Mr. Guidry claims the accident happened to the south corner of North street where the hat was found, a distance of over 50 feet, the width of North street being 53 feet curb to curb. Even if we could account for the finding of that hat for the reasons urged by counsel for defendants, how would it be possible to explain how the piece of broken ice was also found in the middle of North street? It can hardly be said that it was also blown by a wind coming from the north line of North street, as such a wind could have little effect in blowing back a chunk of ice to a distance exceeding 25 feet. The simple, natural, and logical explanation of all this is, that deceased was carrying the wood and ice under his arm and when struck, prompted by an instinctive impulse, pressed these objects under his arm, one piece happened to drop in North street and other broken pieces of ice he carried, with pieces of wood, beyond the north

line of North street where they were seen flying by Mr. Guilbeau who was driving a car southward at the time. As deceased was holding the wood and ice, it is probable they were carried along with his body and his hat being loose on his head fell where he was struck, near the south corner of North street and under the electric light.

Mr. Guidry says he saw Cahanin and his mule when they were crossing the avenue but did not see deceased until he suddenly emerged 7 or 8 feet in front of his auto; that he attempted to swerve immediately to his left but that it was too late and that he unavoidably struck deceased with the right front fender of his car. The fact is, that when he collided with deceased he did not know that he had struck a human being and only realized that fact when Sims rolled over from his right fender. He says, when he first saw Cahanin and the mule, he was then about midway of the block between North street and Bellevue street, the direction from which he was traveling. This block between these two streets is 340 feet in length. As he saw Cahanin when he was about the middle of that block, he was then at a distance of about 170 feet from North street where Cahanin was crossing with his mule.

The city ordinance of Opelousas fixes the speed limit at 20 miles an hour. Mr. Eckart, general manager for Mr. E. M. Boagni, testifies that Mr. Guidry had explicit instructions never to drive his car over 20 miles an hour.

Mr. Guidry testifies that when he got to the middle of the block between North and Bellevue streets, at the time he first saw Cahanin and the mule, that he was then going between 20 and 25 miles an hour. It is evident that he was then violating the speed ordinance of the city of Opelousas, and the explicit instructions he had received from Mr. Eckart. He says when he saw Mr. Cahanin he slowed down a bit and that he again slowed down on seeing a car approaching on the avenue from the north. He says his vision was affected by the lights of the on-coming car to the extent that he kept his eyes on his right side of the road and says in another part of his testimony that he kept looking straight ahead. Again he says, it would have been "foolish" for him to look on the west side of the road into the headlights of an approaching car. As he passed North street, his testimony is that he was going about 18 or 20 miles an hour.

After his eyesight had been affected in the way above stated, Mr. Guidry says, he passed North street at 18 or 20 miles, showing a probable reduction in his speed of 2 miles an hour, if he was then going at 18 miles. He further says, when he passed North street a form suddenly appeared in front of his car; that he applied his brakes but could not avoid the collision. On being questioned as to whether he was going 20 or 25 miles an hour at that time, he answered, he did not know but that it might have been at that speed more or less, and then proceeds to qualify this statement by saying, it "couldn't have been over 20, because I very seldom drive over 20 miles an hour inside of town."

At the time of the impact his vision was still affected by the headlights of the approaching car, and, according to his own testimony, he might then have been going at the speed of 25 miles an hour.

Mr. Andrus, testifying for defendants, says he saw the car Guidry was driving after the accident. He says it had stopped a little north of a sign at the lumber yard and fixed the distance from there as being about 75 feet north of North street, where the car had come at rest.

As the Guidry car, according to Mr. Guidry's testimony as hereinabove pointed out, was about 10 or 12 feet from the north line of North street when the collision occurred, his car continued on its way, after the impact, for a distance over 60 feet before it came to a stop, if the estimate of Mr. Andrus be correct.

Mr. Guidry says his car went about 25 or 30 feet after the collision. One of the witnesses says Mr. Guidry seemed dazed after the accident. There is nothing astonishing if he were in that condition immediately thereafter. After such an experience, it is not likely that he could say with any degree of accuracy the distance his car had gone after the impact. He was also interested to show that he had not been traveling at a speed in excess of the town ordinance and in violation of the specific instructions which had been given him, leaving aside the consideration he might have had for the interest of his employer. On the other hand there is nothing to indicate that Mr. Andrus could have been under such influences at the time or under any other, which could have affected his testimony in any manner.

Mr. Guilbeau, who was driving the on-coming car from the north to which Mr. Guidry refers, says he stopped his car opposite where the "old man was lying," referring to Sims, which was about 20 feet before he "got to North Street." He says that Mr. Guid-

ry's car traveled about 40 or 50 feet north of the point of the accident, evidently referring to the point where the old man was lying. This point, according to his testimony, being about 20 feet from North street, the Guidry car came to rest about 60 or 70 feet from the north line of that street, and about the distance estimated by Mr. Andrus, above stated.

The distance fixed by the testimony of Mr. Andrus may therefore be accepted as correct, and which shows, as before remarked, that the Guidry car came to a stop at about 60 feet from the point of collision, based on the point where it occurred, according to the evidence of Mr. Guidry.

Mr. Guilbeau says that when he got at about 20 or 30 feet from the Guidry car, he heard a noise and saw a bunch of wood going up in the air and that he slowed down. Obviously, he saw that after the impact which created the noise. This bunch of wood flying in the air indicates that there was considerable momentum to the Guidry car as it kept on its run after the collision, although the brakes had been applied, according to Mr. Guidry. The flying of this bunch of wood, the fact that Guidry continued northward about 60 feet after the impact, notwithstanding the application of the brakes which were in good condition as shown by the evidence, show that the Guidry car had not been slowed down to either 18 or 20 miles an hour when it passed North street and was far from going at that moderate rate of speed when it collided with Henry Sims.

The foregoing calculation is made on the proposition that the collision occurred north of North street.

The fact is, however, that it actually happened near the south corner of North street as shown by the facts to which we have referred. It follows from this that after colliding with deceased, the Guidry car went over North street 53 feet wide, and whether we accept the point where it stopped either according to the testimony of Guidry, Andrus, or Perkins, the car traveled a distance of 100 feet or more after the collision before it came at rest.

Counsel for defendants say that Mr. Guidry is the only witness who saw the accident and that his testimony should be accepted as fixing the rate of speed at which he was traveling. Even after he had passed North street and at the time of the accident when he was still blinded by the headlights of the Guilbeau car and when he should have slowed down to a safe rate of speed, he could not say, as his testimony shows, whether he was going at 20 or 25 miles an hour or at a rate "more or less" than that speed.

Counsel for defendants contend that the testimony of Mr. Cahanin, the mule driver, shows that Mr. Guidry was traveling at a normal rate of speed. This witness said he thought Mr. Guidry was going at a normal rate of speed, but then adds, "I am not judge of speed. I can't say how he was traveling." It was when Mr. Cahanin was crossing the avenue that he saw the Guidry car coming towards him. It has frequently been held by this and other courts that no one can judge with any degree of accuracy at what speed a car is traveling when advancing towards the person who attempts to make this estimate. In daytime such an estimate is of little value and at night it has none. It may be contended by counsel for defendants that Mr. Cahanin had entered North street and from that point observed the Guidry car. Even if so, his estimate would have been based on a diagonal view of the car and would have scarcely been more reliable than one deducted from observations of a car coming directly towards him.

Messrs. Sword and Breaux, auto mechanics, testified that the stoppage distance of a Ford car traveling at a speed of 20 miles an hour is, from the application of the brakes, 5 to 7 or 8 feet measuring from the point where these brakes are applied.

If we took this estimate as a criterion to fix the distance a Ford could be stopped, as the Guidry car continued about 60 feet after the impact, and certainly over 50 feet after the brakes were applied, admitting that the collision occurred north of North street, the inescapable conclusion would be that the car was going at a very high rate of speed; and, if the collision happened at the south corner of North street, its speed necessarily must have been still greater.

Mr. Culbertson, witness for defendants, made three actual tests of the distance the Guidry car, the one in question, could be stopped after the application of the brakes. These tests, according to Mr. Culbertson, showed that this car was stopped at a distance of about 31 feet from the point where the brakes were applied. Taking these three tests as a proper criterion in this case, they show that this car would not have gone 50 or 60 feet or about 100 feet beyond the point of collision with deceased had it been going at anything approaching 20 miles an hour.

The district judge found that the Guidry car was going fast and we have no hesitancy

in coming to that conclusion. The court did not say, however, that it was traveling at a speed exceeding 20 miles at the time of the impact.

 From the facts and circumstances to which we have referred, we find that it was going at a much faster speed than that at the time. The speed at which it was moving was far in excess of 20 miles an hour. It is true that a party will not be held liable for a mere technical violation of a speed ordinance. In this case, however, the speed at which Guidry was traveling at the time of the collision was excessive, and under the conditions then existing, was the proximate cause of the accident and the result of the negligence of Guidry, the driver of the car.

 Counsel for defendants contend that should it be held that Guidry was negligent, plaintiff could not, however, recover, as Henry Sims was guilty of contributory negligence. Counsel for defendants refer to the fact that there is no pedestrian crossing from where North street enters Railroad avenue on to the west side of that avenue. This is true, but the evidence shows that the St. Landry Lumber Company is engaged in a large retail lumber business on the west side of Railroad avenue and that many people go across that avenue from North street at all times. It is shown that an electric city light is kept burning at night at the south corner of North street and that it was burning on the night of the accident. This light, it is shown, illuminates clear across the avenue and we are unable to see why the deceased could be chargeable with negligence in walking across that avenue, at a time when the Guidry car was at a considerable distance from the south line of North street.

Counsel for defendants, among many other citations, refer to the case of Lester v. Roach, 155 La. 947, 99 So. 707, where the court held that, when a policeman on a dark night and during a high wind and heavy rain, while traveling a street at a place different from the regular crossing, and holding an umbrella over his head, was struck by defendant's automobile, driven at a moderate rate of speed, with all lights burning, plaintiff not observing the approach of the car and having nearly reached the curbing when struck by the right front fender and light of the automobile, plaintiff's negligence was the proximate cause of the accident.

The only similarity, between the cited case and the instant case, that we can see, is that the night was dark, that all the lights were burning on defendant's car, and that Sims

was struck when he had nearly reached the curbing by the right front fender of Guidry's automobile. We say this because there was no heavy rain and high wind when the collision herein occurred, nor was the deceased holding an umbrella over his head nor was Guidry driving his automobile at a moderate rate of speed. Henry Sims was, at the time, crossing the avenue in calm weather with no heavy rain or high wind to batter his face, with no umbrella to obstruct his vision, but was then favored by a bright electric light shining from the corner of North street across the avenue and had the right to assume that the on-coming Guidry car would be driven at a reasonable rate of speed and that he would not be negligently and inexcusably run over while he was going across the avenue.

The evidence shows that Mr. Guidry frequently drove his car over the avenue and knew that people crossed it to and from the east and west side at the point where deceased was crossing. If Mr. Guidry had slowed down at a moderate rate of speed after his vision was disturbed by the lights from Mr. Guilbeau's headlights and had looked to the west, instead of fixing his vision inflexibly ahead of him or to his right, he would have seen Sims coming across and would not have struck him just as he was stepping to a point of safety on the eastern curb of the avenue.

Mr. Guidry was clearly at fault and deceased was not guilty of contributory negligence.

Defendants were correctly held liable for damages.

### Amount.

█ Deceased was a common laborer, earning in 1925, 1926, and 1927, $1.75 a day, including Sundays when he served as watchman.

He was 69 years old when he died but was very vigorous, remarkably well preserved and efficient. In 1932, his wages were reduced, but his employer explains this reduction was due to the economic conditions.

He had, at his death, a life expectancy of over nine years. The proof shows all he earned went to his family to which he was devotedly attached; that he had no vices, did not drink or gamble, unusual qualities for a colored man. He lived in perfect harmony with his surviving widow, the complainant in this case.

We think the amount decreed below is inadequate and should be increased to at least $2,000, which is certainly not in excess of the

amount usually allowed in cases of this character.

It is therefore ordered, adjudged, and decreed that plaintiff have judgment against Edward M. Boagni, Jr., and Richard O. Eckart, testamentary executors of E. M. Boagni, deceased, made parties to this litigation as defendant and appellant under order of this court and as prayed for by said executors; that the judgment appealed from be amended by increasing it in favor of plaintiff against defendant from the amount decreed below of $1,750 to the sum of $2,000 and as thus amended and increased the judgment be affirmed with costs.